10 P.3d 1181

Dennis YAUCH, Plaintiff/Appellee,

v.

SOUTHERN PACIFIC TRANSPORTA-TION COMPANY, a Delaware corporation, Defendant/Appellant.

No. 2 CA–CV 99–0086.

Court of Appeals of Arizona, Division 2, Department A.

Feb. 29, 2000.

Review Denied Dec. 5, 2000.

---

396

ents issues of first impression in Arizona as to whether the "sheltered employment" doctrine recognized in Arizona's workers' compensation case law applies to FELA actions and whether, based on that doctrine, the trial court properly excluded evidence relating to SP's mitigation-of-damage defense. We conclude that the court erred in applying that doctrine to exclude evidence of a "Disability Management and Internal Placement Program" (the Program)[1] and of SP's offer to return Yauch to his job with accommodations. We further conclude that the court erroneously admitted evidence of certain post-accident conduct by SP. Accordingly, we reverse the judgment and remand the case for a new trial.

## BACKGROUND

¶2 Yauch began working for SP in 1979. In March 1995, Yauch injured his back while in the course and scope of his employment as an SP locomotive engineer when his seat back broke and caused him to fall backward. The injury resulted in several herniated lumbar and thoracic discs. SP admitted liability for any damages proximately caused by the incident. After undergoing back surgery in September 1995, Yauch briefly attempted to work as a yard service engineer for SP in early 1996, but stopped on the advice of his neurosurgeon, Dr. Goldfarb, because it had caused new and additional symptoms. Goldfarb ultimately released Yauch to work in August 1996, with various restrictions. According to Goldfarb, those restrictions "permanently disabled [Yauch] from his job as an engineer."

¶3 Yauch was not gainfully employed from early 1996 through the time of trial in January 1999, but instead, returned to school to obtain a degree and to develop marketable skills. Yauch's labor market consultant, Lisa Goldman, testified that he had no transferable skills and could earn only minimum wage with his present education and training.

Gabroy, Rollman & Bossé, P.C. By John Gabroy and Richard Brown, Tucson, and Garry B. Bryant, Tucson, Attorneys for Plaintiff/Appellee.

Byrne, Beaugureau, Shaw, Zukowski & Hancock, P.C. By Anthony J. Hancock and Amy Schwartz, Phoenix, Attorneys for Defendant/Appellant.

PELANDER, Presiding Judge.

¶1 In this personal injury action filed under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 through 60, defendant/appellant Southern Pacific Transportation Company (SP) appeals from a judgment entered on a jury verdict in favor of plaintiff/appellee Dennis Yauch. The case pres-

---

1. Apparently, in January 1997, during the course of this litigation, Union Pacific Railroad Company merged with SP and assumed its FELA liabilities. See *Dyson v. Southern Pac. Transp. Co.*, 308 Ariz. Adv. Rep. 4, ¶5, — Ariz. —, ¶5, — P.2d —, ¶5, 1999 WL 1025321 (Ct.App. September 23, 1999). The Program was actually Union Pacific's, not SP's. *Id.* Nonetheless, because the parties and the trial court referred to the defendant as SP throughout the lower court proceedings and because the appellate briefs do likewise, we continue that practice here.

She further testified that, if Yauch were to obtain a four-year degree, he could earn approximately $25,000 a year. Based on that information, Yauch's expert economist, John Buehler, Ph.D., testified that the present value of Yauch's future lost earnings ranged from $1.2 to $1.4 million, depending on whether Yauch obtained a degree. The jury awarded Yauch $1,750,448 in damages.

## DISCUSSION

### I. Exclusion of Evidence Relating to SP's Mitigation of Damage Defense

¶ 4 In its answer, SP affirmatively alleged that Yauch had failed to mitigate his damages. In support of that defense, SP disclosed its intent to introduce evidence relating to the Program and Yauch's alleged failure to take advantage of it. Based on SP's discovery disclosures and the pretrial depositions of its former director of disability management, its manager of vocational rehabilitation, and its outside vocational rehabilitation expert, SP contended the Program would have assisted Yauch in obtaining vocational retraining, if necessary, and alternative employment either with or outside the railroad, consistent with Goldfarb's restrictions. SP's evidence suggested that, through the Program, Yauch potentially could have earned significantly more future income than the range Goldman testified to and Buehler adopted. According to SP, Yauch failed to mitigate his future wage loss by failing to participate in the Program.

¶ 5 In their depositions, the SP witnesses testified extensively about how the Program worked, its objectives, its benefits and effectiveness, and various jobs within SP for which Yauch could have qualified and possibly obtained had he expressed an interest in and applied for them. In addition, SP proffered a number of letters it had sent to Yauch or his representative between February 1997 and April 1998, informing Yauch of the availability of rehabilitation services and specific job openings within SP that were deemed suitable for him and for which he could have applied through the Program. The annual salaries of those jobs ranged from approximately $28,000 to $48,000.

Yauch testified in his deposition that he had not pursued SP's offered services or explored the Program's internal placement opportunities.

¶ 6 SP also offered evidence to demonstrate the relative success of the Program, which commenced in 1989. As of July 1998, 216 injured employees had been placed in alternative positions through the Program. Of that number, 178 employees were still active and fifty-three had been promoted. Of the thirty-eight inactive employees, only eight had been discharged or disqualified. SP's vocational rehabilitation expert testified in deposition that he had placed twenty to twenty-five people through the Program and that SP had kept all its promises to his clients. Similarly, SP's director of disability management testified in deposition that most injured employees who want to continue working for the railroad and who participate in the Program will "be placed within the [SP] system for all practical purposes." SP also offered affidavits from three of its employees who had successfully participated in the Program.

¶ 7 In July 1998, Yauch's immediate supervisor testified in deposition that he could accommodate Goldfarb's restrictions. In a letter to Yauch dated August 13, 1998, the day before the deadline for supplementing disclosure, SP offered him the opportunity to return to work as an engineer with appropriate accommodations based on his physical restrictions. That letter signified a distinct change in SP's position, in that SP previously had instructed Yauch to return to work with no restrictions.

¶ 8 In September 1998, approximately four months before the case was tried, Yauch moved in limine to exclude all evidence relating to the Program and to SP's offer to return Yauch to work as an engineer with accommodations. Yauch argued then, as he does now, that the evidence was irrelevant because any jobs allegedly available under the Program constituted "sheltered employment," an impermissible basis for evaluating loss of earning capacity (LEC) under Arizona workers' compensation law; that the evidence lacked foundation; and that the evi-

dence should be excluded under Rule 403, Ariz. R. Evid., 17A A.R.S. The trial court granted Yauch's motion, ruling that the Program constituted sheltered employment under *Allen v. Industrial Commission,* 87 Ariz. 56, 347 P.2d 710 (1959), and *Doles v. Industrial Commission,* 167 Ariz. 604, 810 P.2d 602 (App.1990), and that "Arizona law concerning the measure of loss of earning capacity is not inconsistent with federal substantive law interpreting the FELA." The trial court also precluded any evidence of SP's willingness to have Yauch return to work as an engineer with accommodations.

¶ 9 SP contends the trial court "committed legal error" by "inject[ing] state law workers' compensation principles into this FELA case" to determine "whether evidence of the Program was admissible on the affirmative defense of Yauch's failure to mitigate damages." According to SP, Arizona workers' compensation law on sheltered employment does not apply to FELA cases such as this and is inconsistent with federal law that applies to such cases. SP further contends that, even if state law principles were applicable, "neither the jobs offered by the Program, nor the accommodated engineer's position, were 'sheltered employment' as defined by state law, or at the very least, there were factual issues regarding the nature of the jobs which should have been submitted to the jury."

 ¶ 10 The parties dispute the appropriate standard of review that we should apply to the trial court's evidentiary ruling. Generally, we will affirm a trial court's admission or exclusion of evidence absent a clear abuse of discretion or legal error and resulting prejudice. See *Cervantes v. Rijlaarsdam,* 190 Ariz. 396, 398, 949 P.2d 56, 58 (App.1997); *Gasiorowski v. Hose,* 182 Ariz. 376, 382, 897 P.2d 678, 684 (App.1994). However, we review de novo questions of alleged legal error, including those relating to evidentiary rulings. *Tovrea Land & Cattle Co. v. Linsenmeyer,* 100 Ariz. 107, 114, 412 P.2d 47, 52 (1966); *State v. Johnson,* 184 Ariz. 521,

523, 911 P.2d 527, 529 (App.1994). Not surprisingly, Yauch characterizes the trial court's granting of his motion in limine as a discretionary ruling subject to deferential review, and SP contends the trial court erred "as a matter of law" in excluding the proffered evidence of the Program, Yauch's failure to participate in it, and SP's willingness to return Yauch to his engineer position with appropriate accommodations. Because the trial court based its evidentiary ruling on substantive legal principles, we review the ruling de novo.

 ¶ 11 Although the parties characterize the trial court's ruling differently, they seem to agree on some basic, well-established principles applicable to this case. First, federal substantive law exclusively governs issues of both liability and damages in FELA cases, including those brought in state court.[2] *St. Louis Southwestern Ry. Co. v. Dickerson,* 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303, 306 (1985); *South Buffalo Ry. Co. v. Ahern,* 344 U.S. 367, 371–72, 73 S.Ct. 340, 342–43, 97 L.Ed. 395, 401 (1953); *Kauzlarich v. Atchison, Topeka & Santa Fe Ry. Co.,* 910 S.W.2d 254, 256 (Mo.1995). Second, issues relating to the measure and mitigation of damages in a FELA case also are matters of federal substantive law. *Norfolk & W. Ry. Co. v. Liepelt,* 444 U.S. 490, 493, 100 S.Ct. 755, 757, 62 L.Ed.2d 689, 693 (1980); *Kauzlarich,* 910 S.W.2d at 257–58. Thus, federal law controls the determination of whether the evidence supports an instruction on the plaintiff's duty and alleged failure to mitigate damages. *Kauzlarich,* 910 S.W.2d at 258; *Hawkes v. Norfolk & W. Ry. Co.,* 876 S.W.2d 705, 706 (Mo.Ct.App.1994).

 ¶ 12 This court has held, however, that a state's rules of evidence are procedural rules that apply to and govern FELA cases brought in state court, so long as the evidentiary rule does not interfere with, lessen, or destroy a party's federal substantive rights under the FELA. *Padilla v. Southern Pac. Transp. Co.,* 131 Ariz. 533, 534–35, 642 P.2d 878, 879–80 (App.1982). See also *Eubanks v.*

---

2. Although the FELA is a federal statute, an injured railroad employee may bring a FELA action in state court, as Yauch did here. See *St. Louis Southwestern Ry. Co. v. Dickerson,* 470 U.S.

409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303, 306 (1985); *Chapman v. Union Pac. R.R.,* 237 Neb. 617, 467 N.W.2d 388, 393 (1991).

*CSX Transp., Inc.,* 223 Ga.App. 616, 478 S.E.2d 387, 390 (1996) ("Although federal law controls substantive matters in a FELA case, in the absence of any interference with substantive rights or defenses under FELA, state rules of procedure and practice (including rules governing the admissibility of evidence) apply."); *Mitchell v. Missouri–Kansas–Texas R.R. Co.,* 786 S.W.2d 659, 661–62 (Tex.1990). Thus, the pivotal issue is whether the trial court's exclusion of SP's proffered evidence improperly "affect[ed] or alter[ed]" SP's substantive rights under federal law. *Padilla,* 131 Ariz. at 535, 642 P.2d at 880.

¶ 13 The answer to that question, in turn, depends on whether federal law entitled SP to introduce the evidence in question in support of its defense that Yauch unreasonably had failed to mitigate his damages. "Under federal law an employee has a duty to mitigate damages by returning to gainful employment as soon as reasonably possible." *Hawkes,* 876 S.W.2d at 706. See also *Brown v. Chicago & North W. Transp. Co.,* 162 Ill.App.3d 926, 114 Ill.Dec. 165, 516 N.E.2d 320, 325 (1987); *Kauzlarich,* 910 S.W.2d at 256. That duty includes "seeking reasonable alternative employment" and "accept[ing] work he could perform." *Southern Pac. Transp. Co. v. Fitzgerald,* 94 Nev. 241, 577 P.2d 1234, 1235 (1978). As one court has stated:

> An unemployed plaintiff who is able to look for work does not satisfy his duty to mitigate by waiting passively for employment to be offered. The opportunity to mitigate is not merely the opportunity to accept a job, but the opportunity to seek appropriate work when one is able to do so. If that opportunity is shown to have existed, the issue of mitigation should not normally be prevented from reaching a properly instructed jury.

*Wilson v. Union Pac. R.R. Co.,* 56 F.3d 1226, 1232 (10th Cir.1995).

¶ 14 The trial court's ruling was based solely on the sheltered work principle recognized in Arizona workers' compensation case law. In that context, "earning capacity must be measured by competition in the open labor market," *Doles,* 167 Ariz. at 607, 810 P.2d at 605, and "cannot be accurately measured by make-work or sheltered work," *id.* at 606, 810 P.2d at 604, which "results when an employer retains 'at their previous wages all employees disabled as the result of on-the-job injuries.'" *Rent A Center v. Industrial Comm'n,* 191 Ariz. 406, ¶ 8, 956 P.2d 533, ¶ 8 (App.1998), quoting *Allen,* 87 Ariz. at 67, 347 P.2d at 718. As we noted in *Rent A Center,*

> [S]heltered employment does not reflect the employee's earning capacity in a competitive situation but rather a company policy which, if abrogated for any reason by the employer, will force the employee into a position where he will be unable, because of his injuries, to continue to earn such wages or to secure equivalent employment.

191 Ariz. at ¶ 8, 956 P.2d at ¶ 8, quoting *Allen,* 87 Ariz. at 68, 347 P.2d at 718.

¶ 15 Yauch contends those sheltered work concepts should apply equally to FELA cases because "FELA functions as the nearest equivalent to a workers' compensation scheme for railroad workers," the purposes of the two laws "are very similar," and "the principles for measurement of [LEC] under FELA and the workers' compensation statute are the same." Without citing any authority that directly supports those propositions or that applies any principles of state workers' compensation law to FELA claims, he argues that, conversely, "there is no authority indicating that the Arizona principles are inconsistent with FELA law." In contrast, emphasizing the need for uniform, consistent application of exclusively controlling federal law to FELA cases, SP points to the lack of any "federal precedent for excluding continued employment with the railroad employer in an alternative position from consideration as 'gainful employment'" in such cases.

¶ 16 We find SP's argument more compelling and, therefore, disagree with the trial court's legal conclusions upon which its evidentiary ruling was based.[3] Yauch has not

---

3. In *Dyson,* this court upheld the trial court's exclusion of evidence relating to the Program

because SP "waived any claim of error about the trial court's ruling precluding evidence about the

cited, nor have we found, any cases in which courts have borrowed sheltered employment concepts from state workers' compensation law and applied them to FELA claims. In Arizona, those concepts arose and have been applied only in the workers' compensation context, which involves a comprehensive statutory scheme that governs and limits claims and recovery, special administrative procedures, and a non-jury decision-making process, all of which are quite different from the adjudication system for FELA claims. See *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427, 440 (1994) ("That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute."). We therefore question both the trial court's reliance on sheltered employment principles to exclude SP's proffered evidence and its conclusion that such principles are "not inconsistent with federal substantive law interpreting the FELA."

¶ 17 But even assuming those principles may apply to FELA cases, we also disagree with the trial court's conclusion that the Program and the types of job openings of which SP informed Yauch, including a return to his engineer position with accommodations, "constitute 'sheltered employment.'" Several factors lead us to a contrary conclusion. First, the railroad industry's compensation system for on-the-job injuries historically has been treated differently, as evidenced by Congress's enactment of the FELA over ninety years ago. Second, as the record in this case reflects, the railroad industry also is unique in its wage scales relative to the open labor market. Railroad jobs typically pay more than similar skills might command in the non-railroad sector. Third, the internal positions available through the Program are neither offered out of sympathy nor the type of "make-work" jobs that unrealistically inflate an injured employee's future earning potential. *Doles*, 167 Ariz. at 606, 810 P.2d at 604. Rather, the positions are existing jobs

that require staffing and, with the exception of security officer positions, are filled not only with injured applicants from the Program but also with other SP applicants and, if necessary, with outside applicants from the open labor market. Fourth, an injured employee such as Yauch is not guaranteed or assured of obtaining a particular job opening through the Program. Rather, he must apply and compete with other applicants.

¶ 18 The foregoing factors that characterize the Program in general clearly differentiate it from the type of sheltered employment that Arizona courts have refused to consider in determining LEC in workers' compensation cases. And, the record establishes that the Program, as specifically applied to Yauch in this case, does not constitute sheltered employment. After Yauch stopped working in February 1996, SP did not retain him in a specially created position. Nor did SP guarantee him continued employment. The Program merely offered Yauch the opportunity to obtain vocational retraining and to apply for various job openings within the SP system. Under these circumstances, evidence of comparable employability in the open labor market is not a prerequisite to admission of the evidence. Cf. *Cramer v. Industrial Comm'n*, 19 Ariz.App. 379, 507 P.2d 991 (1973).

¶ 19 Contrary to Yauch's argument, we find SP's proffered evidence relevant to its defense that Yauch failed to reasonably mitigate his damages. With certain exceptions not applicable here, "[a]ll relevant evidence is admissible." Ariz. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ariz. R. Evid. 401. In other words, evidence is relevant if it "relates to a consequential fact" that is placed in issue by "the pleadings and the substantive law" and if it "alter[s] the

program on Rule 401 and Rule 403 grounds, and because either basis [would] support the court's ruling." *Dyson*, 308 Ariz. Adv. Rep. 4, ¶ 7, — Ariz. ——, ¶ 7, —— P.2d ——, ¶ 7, 1999 WL 1025321. In contrast, SP timely presented and

preserved its challenge to the trial court's evidentiary ruling here and supported its challenge with a detailed offer of proof. Yauch does not rely on *Dyson*, and we find it unhelpful to our analysis.

probability, not prove[s] or disprove[s] the existence, of a consequential fact." *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 496, 733 P.2d 1073, 1079 (1987). "[R]elevance requires only a modicum of rationally probative force." *Id.* at 499, 733 P.2d at 1082.

¶ 20 Yauch's alleged failure to reasonably mitigate damages was the cornerstone of SP's pretrial defense. SP timely asserted that defense in its answer, in its discovery disclosures, and in the joint pretrial statement. SP also presented substantial evidence to support the defense in response to Yauch's motion in limine. The trial court, without objection by Yauch, instructed the jury on his duty to mitigate damages. Whether he fulfilled that duty was a "consequential fact" in this case. *Id.* at 496, 733 P.2d at 1079. SP's proffered evidence, though strongly contested by Yauch, was relevant to that issue.

¶ 21 Referring to the Program as a "sham," however, Yauch contends various flaws in SP's proffered evidence are fatal to its admissibility. Citing portions of the SP witnesses' deposition testimony, he points out that, unlike his engineer job, most of the Program positions were at-will jobs not covered by a collective bargaining agreement; none of the Program job openings of which SP had informed Yauch was available in Tucson, and Yauch had sound reasons, based on family and health concerns, for refusing to relocate;[4] SP did not actually offer Yauch any jobs, but merely afforded him an opportunity to apply for various job openings through the Program, without knowing how many people would apply for any of the openings, whether the hiring authority ultimately would hire Yauch for any of the jobs or whether other railroads or non-railroad employers had similar job openings and, if so, would consider or hire Yauch for them; SP's witnesses did not know whether other railroads have programs similar to SP's or whether they would hire Yauch as a locomotive engineer with his medical limitations; and the Program has a "secondary benefit" of reducing LEC damage claims in FELA cases. Based on an affidavit from Lisa Goldman, Yauch also asserts that

he did not meet the minimum requirements for any of the Program positions except security officer because of shortcomings in his education or experience or because of his medical limitations.

¶ 22 Yauch's argument overlooks several points. First, the evidence concerning whether Yauch would qualify for the various Program positions was disputed. In determining whether evidence was improperly excluded, we view the evidence in the light most favorable to its proponent, maximizing its probative value. *Conant v. Whitney*, 190 Ariz. 290, 292, 947 P.2d 864, 866 (App.1997); *State v. Petzoldt*, 172 Ariz. 272, 276, 836 P.2d 982, 986 (App.1991). Second, despite Yauch's various criticisms of the Program, the alleged deficiencies in SP's proffered evidence neither render it irrelevant nor destroy its foundation, as Yauch maintains. The points he raises do not affect the admissibility of the evidence but, rather, its weight, which is a question for the jury. See *City of Phoenix v. Clauss*, 177 Ariz. 566, 571, 869 P.2d 1219, 1224 (App.1994).

¶ 23 Courts in other FELA cases implicitly have recognized the admissibility of evidence similar to that proffered by SP here. See, e.g., *Bissett v. Burlington N. R.R. Co.*, 969 F.2d 727, 732 (8th Cir.1992) (upholding admission of evidence of wages and earnings of railroad's clerks and dispatchers, of railroad's suggestions that plaintiff apply for those jobs, and of plaintiff's failure "to seek such employment," finding such evidence "relevant to the issue of mitigation of damages"); *Brown*, 114 Ill.Dec. 165, 516 N.E.2d at 325 (whether plaintiff had made reasonable effort to find work internally within railroad was question of fact for jury); *Tingstrom v. Smith*, 630 So.2d 257, 264 (La.Ct.App.1993) (railroad supervisor's testimony about other internal jobs that injured plaintiff could perform was "clearly relevant ... as it ha[d] the tendency to make a fact of consequence, the future earning potential of the plaintiff, more or less probable"); *Kauzlarich*, 910 S.W.2d at 258 (trial court erred in failing to give mitigation-of-damage instruction when evidence showed, inter alia, that railroad had

---

**4.** Two of the openings were for the positions of supervisor of yard operations in Yuma and No-

gales, Arizona, with a starting annual salary of approximately $43,000.

extended plaintiff "an offer to train for the supervisory position of assistant trainmaster," that plaintiff "unilaterally withdrew from the training program," and that plaintiff "may have been physically able to return to at least desk work"); *Hawkes,* 876 S.W.2d at 707 (finding substantial evidence from which jury could conclude that plaintiff failed to mitigate damages, despite evidence he had "refused offers of reemployment with defendant in clerical or other positions because he was concerned about layoffs, loss of seniority, probationary employment, and relocation" and despite lack of evidence that "other employment was available or that plaintiff could have obtained other employment within any particular period of time"); *Missouri Pac. R.R. Co. v. Roberts,* 849 S.W.2d 367, 368 (Tex.App.1993) (railroad presented evidence of internal placement program to show that "plaintiff was offered a possible opportunity to secure a good management position" but "lost the opportunity because he did not follow-up" on request to obtain vocational testing).

¶ 24 In holding that the trial court's failure to give a mitigation-of-damage instruction constituted reversible error, the court in *Brown* stated:

> [The railroad's] testimony raised a factual question concerning Brown's alleged failure to mitigate from which a jury might reasonably conclude that Brown was indifferent to finding alternative employment in the following respects: (1) he refused to cooperate with [the railroad's] efforts to place him in another position within the company; (2) he spurned [the railroad's] plans to provide him with free rehabilitation and counseling services; and (3) he shunned [the railroad's] offers to fund vocational or scholastic training calculated to assist him in obtaining alternative employment. Though there was no evidence presented of other jobs available to him, [the railroad] obviously was never given the opportunity to determine if it could place Brown in another position or educate or retrain him for new duties or responsibilities.

*Brown,* 114 Ill.Dec. 165, 516 N.E.2d at 325. Similarly, SP's proffered evidence presented

triable factual issues on its mitigation-of-damage defense in this case.

¶ 25 As he did in the trial court, Yauch also contends that SP's proffered evidence was inadmissible under Rule 403, Ariz. R. Evid. That rule permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial court did not exclude SP's proffered evidence based on Rule 403 considerations. Nonetheless, Yauch urges us to uphold the court's ruling on that basis because, as he correctly points out, we may affirm on any ground supported by the record. See *Adage Towing & Recovery, Inc. v. City of Tucson,* 187 Ariz. 396, 398, 930 P.2d 473, 475 (App.1996). We decline to do so, however, for several reasons.

¶ 26 First, the balancing of factors under Rule 403 is peculiarly a function of trial courts, not appellate courts. *Readenour v. Marion Power Shovel,* 149 Ariz. 442, 449, 719 P.2d 1058, 1065 (1986). When the trial court expressly has "weighed the factors and decided" to either admit or exclude evidence, we will affirm the ruling absent an abuse of discretion. *Id.* at 449–50, 719 P.2d at 1065–66. But the record here does not reflect that the trial court performed any analysis under Rule 403 or relied on it to support its evidentiary ruling. And, on this record we cannot assume that the court would have excluded SP's proffered evidence based on Rule 403 considerations, particularly when "the issues upon which the challenged evidence might be used in the case ... are of substantial importance and appear to be in controversy." *Id.* at 449, 719 P.2d at 1065.

¶ 27 Second, in the trial court, Yauch contended that, most importantly, SP's proffered evidence "should be excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice and because the jury will be misled." In contrast, on appeal, he argues that, "most importantly, the expansion of the time needed to try this case due to [his] need to

present rebuttal evidence to SP's mitigation defense" would have justified exclusion of the evidence under Rule 403. Despite that shift in focus, we cannot affirm on either basis.

¶ 28 Relevant evidence generally will adversely affect the party against whom it is offered, but that is not the type of prejudice of which Rule 403 speaks. *State v. Schurz,* 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993). Moreover, the conflicting evidence concerning the Program generally, its suitability for Yauch specifically, and his alleged failure to participate in it or to consider returning to his engineer position with accommodations all related to a material issue in the case, rather than to an extraneous or collateral issue that might mislead or unduly confuse the jury. See *State ex rel. McDougall v. Municipal Court,* 153 Ariz. 111, 112–13, 735 P.2d 141, 142–43 (App.1986). Yauch's concerns about the number of new, additional witnesses and the increased amount of trial time required to litigate SP's mitigation-of-damage defense do not justify excluding all of SP's proffered evidence, particularly when the ruling substantially undermined SP's ability to prove its primary defense in the case. In addition, the trial court may address any such concerns on remand by imposing reasonable limits on the number of witnesses and the amount of time each party may expend on those issues. Ariz. R. Evid. 611(a); *Brown v. United States Fidelity & Guar. Co.,* 194 Ariz. 85, ¶ 29, 977 P.2d 807, ¶ 29 (App.1998).

¶ 29 Finally, that some appellate courts in FELA cases have upheld trial court rulings that excluded evidence under Rule 403 of a railroad's internal placement program does not persuade us to affirm the trial court's ruling on a ground it did not reach. See, e.g., *Zimmerman v. Montour R.R. Co.,* 191 F.Supp. 433 (W.D.Pa.1961) (single offer made late and would have required terminating another employee); *Fitzgerald,* 577 P.2d at 1235 (no clear evidence of "any bona fide offers ... or whether they related to reasonable alternative employment"); *Plourd v. Southern Pac. Transp. Co.,* 266 Or. 666, 513 P.2d 1140, 1150 (1973) (single offer made only after "trial was well in progress"). The circumstances and nature of the evidence offered and rejected in those cases differ from the situation presented here. SP timely presented substantial evidence that, though vigorously disputed, could support findings that SP had offered opportunities to Yauch for training and for available, suitable jobs and that other injured SP employees had been successfully placed in Program jobs or had retained their jobs with appropriate accommodation.

¶ 30 SP does not contend, nor do we conclude, that Yauch was required to return to his engineer job with accommodations or to accept any of the Program job openings had he explored those opportunities, applied, and been offered a position. Nor does SP assert that Yauch had to relocate if offered a job outside the Tucson area. SP does contend, however, that it "was entitled to have the jury decide if Yauch could have returned to his former position as an engineer with accommodations, and if not, whether a reasonable person in Yauch's position should have then pursued alternative employment within [SP] in light of all the circumstances presented, including job security, location, and duties." Because we agree with that contention, the trial court erred in excluding SP's proffered evidence, thereby depriving it of a substantial federal right. We find the error reversible because we cannot say the same result probably would have occurred had the evidence been admitted. See *Schwartz v. Farmers Ins. Co.,* 166 Ariz. 33, 36, 800 P.2d 20, 23 (App.1990).

## II. Evidence Relating to SP's Post–Accident Conduct

¶ 31 SP next contends the trial court erred in admitting, over SP's objection, evidence of certain post-accident conduct. The following facts relate to this issue, which we address because it may arise on remand and because it affects Yauch's emotional distress damage claim. See *Clauss,* 177 Ariz. at 570, 869 P.2d at 1223.

¶ 32 Based on both an independent medical examination SP had obtained and input it had received from another consulting physician, SP informed Yauch by letter in October 1997 that he was "cleared ... to return to work with no restrictions" and instructed him

to make arrangements for that within fifteen days. SP sent another letter to Yauch in March 1998, stating that he had not returned to work or informed SP of why he could not do so and reminding him of the need to protect his seniority. Yauch testified at trial that when he had received that letter, he had "[f]elt like blowing [his] brains out." He further testified that the letters were threatening in nature and had caused him "a great deal of distress." As noted earlier, SP ultimately changed its position and offered Yauch an opportunity to return to his engineer job with accommodations. See ¶ 7.

¶ 33 Five days before trial, after the trial court had excluded all evidence of the Program and of SP's willingness to accommodate Yauch in his engineer job, SP moved in limine to exclude any evidence of its initial decision to return Yauch to work without restrictions, of its related communications to Yauch, and of his emotional response to those communications. In return, SP offered to withdraw its mitigation-of-damage defense. In opposing the motion, Yauch argued that evidence of SP's post-accident conduct was independently relevant to the emotional distress aspect of his damage claim, regardless of whether SP withdrew its defense. Relying on *Whitley v. Southern Pacific Transportation Co.*, 136 Or.App. 426, 902 P.2d 1196 (1995), the trial court agreed with Yauch and denied SP's motion.

■ ¶ 34 In view of the posture of the case at the time of its ruling, the trial court erred in admitting the evidence of SP's post-accident conduct in connection with Yauch's damage claim. Even assuming that the "zone of danger" test does not apply because Yauch did not assert a separate, new claim for negligent infliction of emotional distress, see *Gottshall*, 512 U.S. at 557–58, 114 S.Ct. at 2411–12, 129 L.Ed.2d at 449, any emotional distress that resulted from SP's post-accident conduct occurred more than two years after the accident and was, by definition, causally related to that conduct rather than to the accident. Several courts have held that evidence of emotional distress caused by a railroad's post-accident conduct is inadmissible because damages based on such conduct are not recoverable in a FELA action. See, e.g.,

*Lewy v. Southern Pac. Transp. Co.*, 799 F.2d 1281, 1287 (9th Cir.1986) (damages claimed for "aggravation, resulting from [plaintiff's] discharge, of the emotional condition and anxiety he originally developed because of the collision" not recoverable because "such claims are not cognizable under the FELA" and because evidence of subsequent discharge "was not relevant in the present action"); *Anderson v. Louisiana & Arkansas Ry. Co.*, 457 F.2d 784, 785 (5th Cir.1972) ("The admission of the evidence of conduct of the railroad company subsequent to the incident during which [plaintiff's] injury occurred constituted error requiring reversal and a remand for a new trial."); *Shepherd v. Metro–North Commuter R.R. Co.*, 791 F.Supp. 1008, 1011 (S.D.N.Y.1992) (disallowing claim in FELA action for "wrongful refusal to reinstate" based on plaintiff's assertion that railroad had wrongfully delayed his post-injury return to work for six months after doctor had released him).

¶ 35 Based on those authorities, had SP's mitigation-of-damage defense been removed from the case, as SP unsuccessfully suggested before trial, the evidence of its post-accident conduct would have been irrelevant and inadmissible. *Whitley* does not alter that conclusion. In that case, the appellate court upheld the admission of evidence of emotional distress the plaintiff had suffered from humiliation he had experienced when the railroad discharged him due to the conduct in which he had engaged at the time of his accident. The plaintiff's discharge followed soon after his injury and was based on the same conduct that had caused the injury, his alleged failure to follow company safety rules. Moreover, the railroad contended that all the plaintiff's damages flowed from the discharge, not the accident; thus, the railroad attempted to use the post-accident event to preclude any damage recovery. Under those circumstances, the court in *Whitley* found that, because the discharge was so inextricably intertwined with the accident, "there [was] a direct chain of events from defendant's negligence to plaintiff's damages." *Whitley*, 902 P.2d at 1201.

■ ¶ 36 *Whitley* is clearly distinguishable from this case. SP's return-to-work

order that allegedly exacerbated Yauch's emotional distress occurred more than two years after Yauch's accident. That order was unrelated to the facts of the accident itself, but rather, was prompted by Yauch's failure to return to work, a situation similar to that in *Lewy*. In sum, the causal link between the accident and any increased emotional distress that Yauch allegedly suffered after SP ordered his return to work is too remote and attenuated to justify admission of the evidence of SP's post-accident conduct.[5] Admission of that evidence, including Yauch's inflammatory testimony that he had "[f]elt like blowing [his] brains out" after he received SP's March 1998 letter, prejudiced SP.

¶ 37 Although the evidence of SP's post-accident conduct was not relevant to the emotional distress aspect of Yauch's damage claim, the evidence would be relevant to rebut SP's failure-to-mitigate damage defense. As it did in the trial court, SP implicitly concedes that point. Thus, the admissibility of this evidence on remand depends on what evidence SP seeks to introduce to support its defense.

### DISPOSITION

¶ 38 The trial court's judgment is reversed, and the case is remanded for further proceedings consistent with this decision.

CONCURRING: WILLIAM E. DRUKE, Judge, and M. JAN FLÓREZ, Judge.

---

5. We find no merit in Yauch's argument that SP should be equitably estopped from alleging error on this ground because it included a mitigation-of-damage defense in the joint pretrial statement.